**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **ROBERT A. SHAPIRO,** | * | |
| Plaintiff, | * | |
| v. | * | Civ. No. DLB-22-1024 |
| **SHELLPOINT MORTGAGE SERVICING,** *et al.*, | * | |
| | * | |
| Defendants. | | |

**MEMORANDUM OPINION**

Robert Shapiro alleges that his mortgage loan servicer, NewRez LLC d/b/a Shellpoint Mortgage Servicing ("Shellpoint"),[1] placed his loan into forbearance status without his authorization, causing his default on the loan and a dramatic drop in his credit score. ECF 2, at 11. Shapiro, who is self-represented, claims violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962, *et seq.* ("RICO"); the Real Estate Settlement Procedures Act, 12 U.S.C. § 2601 *et seq.* ("RESPA"); the Truth in Lending Act, 15 U.S.C. § 1601 *et seq.* ("TILA"); and the Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136, 134 Stat. 281 (2020) ("CARES Act"). ECF 2, at 18. He also asserts state law claims for breach of contract, gross negligence, and fraud. *Id.* at 15–17. He seeks $30,000 in monetary damages, declaratory judgment, and attorney's fees. *Id.* at 1, 17–18.

Shellpoint moves to dismiss the complaint. ECF 15. Shellpoint certified that in addition to electronic filing, it mailed copies of its motion and accompanying memorandum to Shapiro's address. *Id.* at 3; ECF 15-1, at 17. The Clerk of Court mailed a Rule 12/56 notice to Shapiro on

---

[1] Though Shapiro sued both NewRez LLC and Shellpoint Mortgage Servicing as separate entities, NewRez LLC clarifies that it does business as Shellpoint Mortgage Servicing. *See* ECF 15, at 1.

1

May 24, 2022, advising him that the motion, if granted, could result in dismissal of the case; that he had the right to file a response within twenty-eight days; and that if he did not respond, the Court would resolve the case based on the defendant's materials. ECF 16. Shapiro did not file an opposition. A hearing is not necessary. Loc. R. 105.6. For the following reasons, the Court grants Shellpoint's motion to dismiss the complaint without prejudice.

## I.     Background

The Court accepts the following well-pleaded allegations from the complaint as true when deciding whether the claims survive a motion to dismiss. Robert Shapiro, a former certified mortgage planning specialist and investment advisor, owns a townhouse in Clarksburg, Maryland. ECF 2, at 5, 10. His property is encumbered by a lien securing repayment of a government-backed loan. *Id.* at 5. This loan is serviced by Shellpoint, a mortgage servicing company responsible for collecting and applying borrowers' payments on behalf of the mortgage holder. *Id.* at 7. To do so, Shellpoint collects monthly payments from borrowers then applies them to the loan's principal and interest, taxes, insurance, and other fees or charges assessed to a borrower's account. *Id.* Shellpoint began servicing Shapiro's loan in March 2019. ECF 2-1, at 66.

Shellpoint, as the mortgage loan servicer, earns revenue in several ways. ECF 2, at 7. It earns a per-loan servicing fee as set forth in the note and deed of trust. *Id.* It earns "float" income on unapplied funds, which accrue from the time that a borrower pays until funds are remitted to the mortgage holder. *Id.* It collects and keeps fees, like late fees, directly from the borrower. *Id.* And for certain government-backed loans, it can earn incentive payments if borrowers whose loans are in forbearance accept certain "workout options." *Id.* These workout options, offered by Shellpoint to cure a loan's forbearance status, generally involve repayment plans, deferral agreements, or other loan modifications. *Id.* at 8. Shapiro alleges that Shellpoint could receive

between $500 and $1,000 in incentive payments from the federal government each time a borrower with this type of loan agrees to a workout option, depending on which option the borrower accepts. *Id.* at 8.

Shapiro paid his monthly mortgage on time for approximately sixteen years, including after Shellpoint began servicing his loan. ECF 2-1, at 1. When the COVID-19 pandemic began in March 2020, Shapiro and Shellpoint discussed ways that Shellpoint could assist with loan payments. *Id.* at 55. At the time, Shapiro paid his monthly loan payments automatically, via "ACH automatic payments." *Id.* at 1. Shellpoint offered to place Shapiro's loan in forbearance. *Id.* at 55. Shapiro declined that offer by April 22, 2020. *Id.* Despite this refusal, Shapiro received a letter from Shellpoint on May 4 stating that he had been approved for a forbearance plan that temporarily suspended his mortgage payment obligation for three months. *Id.* at 57. Under the terms of the plan, Shapiro would not be penalized with a late payment charge or negative credit reporting if he missed a mortgage payment in June, July, or August 2020. *Id.* Shellpoint's May letter stated that "[a]s part of your approved Forbearance Plan, if you were set up for ACH automatic payment, we have suspended your ACH automatic draft for the duration of your Forbearance Plan." *Id.*

Shapiro contacted Shellpoint to refuse, once again, the forbearance plan and request that his loan be taken out of forbearance status. *See id.* at 1. Shapiro made a one-time online, manual payment for June 2020. *Id.* at 52. On June 1, he informed Mary Stone, a Shellpoint Loss Mitigation Specialist, in writing that he made this one-time payment. *Id.* He asked for Shellpoint to reconnect his automatic payments "so that the next payment will be taken out seamlessly in July." *Id.* Stone confirmed in writing that same day that Shapiro's June payment was received,

his forbearance was cancelled, and his "ACH drafts will resume on July 1, 2020." *Id.* at 51. She stated that Shellpoint mailed a confirmation letter to him on May 27. *Id.*

Unbeknownst to Shapiro, Shellpoint never reconnected his automatic payments. *Id.* at 53. As a result, his July and August monthly payments were never made. *Id.* at 2. On August 31, Shellpoint sent Shapiro a letter to an incorrect address stating that "[a]s you are aware, your loan is delinquent" and in default. *Id.* at 60. Though the letter stated that Shellpoint made several attempts to contact Shapiro regarding the delinquency, he never received any calls or texts. *Id.* at 7. When Shapiro eventually found out on September 9 that his loan was delinquent, he immediately called Shellpoint and paid the outstanding balance of $3,894.18. *Id.* at 2, 6; ECF 2-1, at 43. Shellpoint waived his late fee because he was not at fault for the payment delay. ECF 2-1, at 3.

On October 19, Shapiro contacted a Shellpoint representative to request a letter in writing that stated that he was not at fault for the delayed payments. *Id.* at 46. He requested that his credit score be returned to its prior score as it "never should've been affected in the adverse way it was." *Id.* In July 2020, Shapiro had a credit report score of 756. *Id.* at 5. By October 12, it had dropped to around 700. *Id.* at 36. Shapiro notes that according to his bank, his score was as high as 817 on October 3. *Id.* at 37.

Shellpoint emailed him that it would work on a letter, but it did "not control what credit scores are with the credit bureaus." *Id.* at 47. On October 22, Shellpoint sent Shapiro a letter stating that "an error occurred causing a delinquent reporting for the July and August 2020 installments" and apologizing for any inconvenience. *Id.* at 66. Shellpoint indicated that it submitted a request to update the credit bureaus to correct the delinquent payments but noted that

"the credit bureaus are responsible for your credit score. You will need to contact them directly for any questions regarding your score." *Id.*

Shapiro filed suit in the District Court of Montgomery County, Maryland on June 24, 2021. ECF 1-1, at 2. Shellpoint received service on April 6, 2022, then timely removed to this Court on April 26. ECF 1, at 4.

## II.     Standard of Review

Under Rule 12(b)(6), a party may seek dismissal for failure "to state a claim upon which relief can be granted." *Robertson v. Anderson Mill Elementary Sch.*, 989 F.3d 282, 290 (4th Cir. 2021) (quoting Fed. R. Civ. P. 12(b)(6)). To survive the challenge, the opposing party must have pleaded facts demonstrating it has a plausible right to relief from the Court. *Lokhova v. Halper*, 995 F.3d 134, 141 (4th Cir. 2021) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A plausible claim is more than merely conceivable or speculative. *See Holloway v. Maryland*, 32 F.4th 293, 299 (4th Cir. 2022). The allegations must show there is "more than a sheer possibility that the defendant has acted unlawfully." *Int'l Refugee Assistance Project v. Trump*, 961 F.3d 635, 648 (4th Cir. 2020) (quoting *Iqbal*, 556 U.S. at 678)). But the claim does not need to be probable, and the pleader need not show "that alternative explanations are less likely" than their theory. *Jesus Christ is the Answer Ministries, Inc. v. Balt. Cnty., Md.*, 915 F.3d 256, 263 (4th Cir. 2019) (quoting *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015)).

When ruling on a Rule 12(b)(6) motion, the Court must accept the allegations as true and draw all reasonable inferences in favor of the pleader. *Williams v. Kincaid*, 45 F.4th 759, 765, 777 (4th Cir. 2022). But the Court does not accept "legal conclusions couched as facts or unwarranted inferences, unreasonable conclusions, or arguments." *United States ex rel. Taylor v. Boyko*, 39 F.4th 177, 189 (4th Cir. 2022) (quoting *United States ex rel. Nathan v. Takeda Pharms. N. Am.,*

*Inc.*, 707 F.3d 451, 455 (4th Cir. 2013)). Merely reciting a claim's elements "and supporting them by conclusory statements does not meet the required standard." *Sheppard v. Visitors of Va. State Univ.*, 993 F.3d 230, 234 (4th Cir. 2021) (quoting *ACA Fin. Guar. Corp. v. City of Buena Vista, Va.*, 917 F.3d 206, 212 (4th Cir. 2019)). On a Rule 12(b)(6) motion, the Court does not "does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses." *Ray v. Roane*, 948 F.3d 222, 226 (4th Cir. 2020) (quoting *Tobey v. Jones*, 706 F.3d 379, 387 (4th Cir. 2013)).

"[P]ro se filings are 'h[e]ld to less stringent standards than formal pleadings drafted by lawyers.'" *Folkes v. Nelsen*, 34 F.4th 258, 272 (4th Cir. 2022) (quoting *Haines v. Kerner*, 404 U.S. 519, 520 (1972)). Accordingly, the Court must construe pro se pleadings liberally. *Bing v. Brivo Sys., LLC*, 959 F.3d 605, 618 (4th Cir. 2020), *cert. denied*, 141 S. Ct. 1376 (2021). But "liberal construction does not require [the Court] to attempt to 'discern the unexpressed intent of the plaintiff[;]'" the Court need only "determine the actual meaning of the words used in the complaint." *Williams v. Ozmint*, 716 F.3d 801, 805 (4th Cir. 2013) (quoting *Laber v. Harvey*, 438 F.3d 404, 413 n.3 (4th Cir. 2006) (en banc)). Thus, a pro se complaint "still 'must contain enough facts to state a claim for relief that is plausible on its face.'" *Thomas v. The Salvation Army S. Territory*, 841 F.3d 632, at 637 (4th Cir. 2016) (quoting *King v. Rubenstein*, 825 F.3d 206, 212, 214 (4th Cir. 2016) (quoting *Twombly*, 550 U.S. at 570)).

### III. Discussion

#### A. RICO claim

Shapiro asserts that Shellpoint engaged in racketeering activity, using wires and the mail, in violation of RICO. RICO's civil provision provides a private cause of action to "[a]ny person injured in his business or property by reason of a violation of [the criminal RICO provisions, 18

U.S.C. § 1962]." *ESAB Grp., Inc. v. Centricut, Inc.*, 126 F.3d 617, 626 (4th Cir. 1997) (quoting 18 U.S.C. § 1964(c)).[2] In order "to provide society with a powerful response to the dangers of organized crime[,]" a successful RICO plaintiff "may recover not only costs and attorney's fees, but also *treble* damages." *U.S. Airline Pilots Ass'n v. Awappa, LLC*, 615 F.3d 312, 317 (4th Cir. 2010) (citing 18 U.S.C. § 1964(c)). The Supreme Court has described RICO's penalties as "drastic." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 233 (1989). The Fourth Circuit has advised that courts should "not lightly permit ordinary business contract or fraud disputes to be transformed into federal RICO claims." *Flip Mortg. Corp. v. McElhone*, 841 F.2d 531, 538 (4th Cir. 1988). Rather, a civil RICO claim is "a unique cause of action that is concerned with eradicating organized, long-term, habitual criminal activity." *Awappa*, 615 F.3d at 317 (quoting *Gamboa v. Velez*, 457 F.3d 703, 705 (7th Cir. 2006)).

To state a civil RICO claim, a plaintiff must plausibly allege conduct of an enterprise through a pattern of racketeering activity. *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985).

---

[2] In relevant part, 18 U.S.C. § 1962 states:

> (a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity . . . to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.
> (b) It shall be unlawful for any person through a pattern of racketeering activity . . . to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.
> (c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.
> (d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

Although Shapiro does not specify under which of 18 U.S.C. § 1962's four subsections he asserts his claims, the Court analyzes his claims under § 1962(a) and (c).[3] These sections make it unlawful for a person to participate in the affairs of an enterprise that affects interstate commerce through a pattern of racketeering activity, or to use or invest any income derived from a pattern of racketeering activity in such an enterprise. 18 U.S.C. § 1962(a), (c).

### 1. RICO enterprise

An enterprise "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). "A RICO enterprise is characterized by 'continuity, unity, shared purpose and identifiable structure.'" *Chambers v. King Buick GMC*, 43 F. Supp. 3d 575, 589 (D. Md. 2014) (quoting *United States v. Fiel*, 35 F.3d 997, 1003 (4th Cir. 1994) (citation omitted)). An enterprise requires proof of three elements: (1) an ongoing organization, (2) the associates of which function as a continuing unit, and (3) existence apart from the alleged pattern of racketeering activity. *United States v. Turkette*, 452 U.S. 576, 583 (1981); *Chambers*, 43 F. Supp. 3d at 589 (citing *Proctor v. Metro. Money Store Corp.*, 645 F. Supp. 2d 464, 477–78 (D. Md. 2009)).

#### a. Enterprise under Section 1962(a)

##### i. Ongoing Organization

To adequately plead the first element of an enterprise, an "ongoing organization," Shapiro must allege facts about the enterprise's structure. *See Kimberlin v. Nat'l Bloggers Club*, No. GJH-

---

[3] If Shapiro is unsuccessful in stating a claim under subsection (c), any claim under subsection (d) necessarily fails. *GE Inv. Private Placement Partners II v. Parker*, 247 F.3d 543, 551 n.2 (4th Cir. 2001) ("Because the pleadings do not state a substantive RICO claim under § 1962(c), Plaintiffs' RICO conspiracy claim [under § 1962(d)] fails as well." (citation omitted)). Consideration of subsection (b) is not warranted either. Shapiro offers no allegations that indicate that Shellpoint, through racketeering activity, acquired interest or control of an enterprise.

13-3059, 2015 WL 1242763, at *3 (D. Md. Mar. 17, 2015) (finding that plaintiff failed to adequately allege first element of RICO claim where he "failed to allege any material facts about the enterprise's structure"). This structure need not be formal; the RICO statute recognizes that an "association in fact" enterprise can exist without "a hierarchical structure or a chain of command; decisions may be made on an ad hoc basis by any number of methods." *Boyle v. United States*, 556 U.S. 938, 948 (2009). Such enterprises are "characterized by the association of its members 'for a common purpose of engaging in a course of conduct.'" *Chambers*, 43 F. Supp. 3d at 589 (quoting *Turkette*, 452 U.S. at 583). But "'[v]ague allegations of a RICO enterprise . . . lacking any distinct . . . structure' will not survive dismissal." *Mitchell Tracey v. First Am. Title Ins. Co.*, 935 F. Supp. 2d 826, 843 (D. Md. 2013) (citation omitted; modifications in *Mitchell Tracey*).

Shapiro describes Shellpoint's business model for its regular mortgaging services, *see* ECF 2, at 6–8, but he does not specify Shellpoint's internal structure, whether the entire company or a select few employees furthered the scheme's purpose, how the enterprise operated, or how decisions were made (ad hoc or otherwise). Without such allegations, he fails to offer any specific facts about the enterprise's structure.

## ii.     Continuing Unit

To satisfactorily allege that an enterprise's associates function as a "continuing unit," Shapiro must, as a threshold matter, allege facts regarding the relationships between or among enterprise participants. *See Kimberlin*, 2015 WL 1242763, at *4 (noting that the complaint contained no allegations "regarding the relationships between or among RICO defendants, much less how they functioned as a continuing unit" (internal quotation omitted)); *Grant v. Shapiro & Burson LLP*, 871 F. Supp. 2d 462, 473 (D. Md. 2012) (finding plaintiff had not adequately alleged

enterprise where complaint "contain[ed] no factual averments regarding the relationships between or among Defendants, much less how they 'function[ed] as a continuing unit'" (citation omitted)). Absent these facts, a "naked assertion" of a continuing unit "need not be credited." *Kimberlin*, 2015 WL 1242763, at *4 (quoting *Grant*, 871 F. Supp. 2d at 473). Shapiro does not allege any facts about the relationships between enterprise participants, let alone how they functioned as a continuing unit. For instance, he does not specify the various roles of the people involved in the enterprise or how they communicated with each other.

Even if he had included those details, to adequately plead a "continuing" unit, Shapiro also must allege how the associates of an enterprise function over a period of time. *Proctor*, 645 F. Supp. 2d at 479–80 (finding plaintiff satisfied continuity requirement by alleging that defendants participated in enterprise identifiable over at least two years and involving at least one hundred repeat transactions). Shapiro attaches an article indicating that incentive compensation for certain post-forbearance loan workout options were introduced at the start of the COVID-19 pandemic. *See* ECF 2, at 8–10. But he does not allege specifically when the scheme took place, whether it is ongoing, or how many transactions were involved. Absent these or similar allegations, his complaint does not adequately plead a continuing unit.

Shapiro fails to adequately allege an enterprise under Section 1962(a) because he does not sufficiently plead an ongoing organization that functions as a continuing unit.[4]

### b. Enterprise under Section 1962(c)

The first two elements of an enterprise under Section 1962(c) are the same as those under

---

[4] Shapiro also must allege that the enterprise is an entity distinct from the pattern of activity in which it engages. *Proctor*, 645 F. Supp. 2d at 477–78; *Turkette*, 452 U.S. at 583. Shapiro has adequately alleged this distinct existence under Section 1962(a). He claims that Shellpoint engaged in normal loan servicing activity and that it separately engaged in a scheme to place loans into forbearance without authorization. *See Chambers*, 43 F. Supp. 3d at 590 (noting that where a

10

Section 1962(a): Shapiro must allege an ongoing organization whose associates function as a continuing unit. For the reasons discussed above, Shapiro fails to do so.

Any claim under § 1962(c) fails for the additional reason that Shapiro has not pled the alleged enterprise is distinct from Shellpoint. Unlike in subsection (a), "to establish liability under 18 U.S.C. § 1962(c), one must allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001). In other words, to satisfy the third element of an enterprise under 1962(c), the "person" alleged to have violated this subsection must be separate and distinct from the "enterprise" or tool through which the RICO violation occurred. *Chambers*, 43 F. Supp. 3d at 588; *Mitchell Tracey*, 935 F. Supp. 2d at 842.

Shellpoint argues that, as the only defendant, it cannot simultaneously be the "person" and "enterprise" for purposes of a § 1962(c) claim. The Court agrees. A corporation may not be liable under § 1962(c) for associating in an alleged enterprise that consists only of its own employees, agents, subdivisions, franchises, or members. *See Entre Computer Ctrs., Inc. v. FMG of Kansas City, Inc.*, 819 F.2d 1279, 1287 (4th Cir. 1987) (affirming dismissal of civil RICO claim where plaintiff alleged the enterprise consisted of a corporate defendant, its officers and directors, and its franchises), *overruled on other grounds by Busby v. Crown Supply, Inc.*, 896 F.2d 833 (4th Cir. 1990); *U1it4less, Inc. v. FedEx Corp.*, 871 F.3d 199, 206–07 (2d Cir. 2017) (discussing § 1962(c)'s

---

plaintiff claims that a defendant is "engaged in legitimate . . . transactions" as well as a fraudulent scheme, it adequately alleges that an enterprise's conduct is separate from the defendant's regular affairs). Though Shellpoint argues that Shapiro fails to satisfy distinctness because the "enterprise" is the same entity as the "person" alleged to have used it, the "enterprise" and "person" need not be distinct under subsection (a). *Chambers*, 43 F. Supp. 3d at 589 n.8 (noting that for a violation of Section 1962(a), unlike Section 1962(c), the "offender and the enterprise need not be separate" and "may be identical" (quoting *Busby v. Crown Supply, Inc.*, 896 F.2d 833, 841 (4th Cir. 1990))).

11

distinctness requirement that a corporation cannot be the enterprise and the person for purposes of RICO claim); *In re ClassicStar Mare Lease Lit.*, 727 F.3d 473, 490 (6th Cir. 2013) (same). Shapiro sues only Shellpoint. He does not indicate that any other entities or individuals are part of the alleged scheme. Shapiro thus fails to adequately allege an enterprise consisting of more than just one entity, as required under § 1962(c).

### 2. Predicate acts of racketeering activity

In addition to an enterprise, Shapiro also must adequately allege the "conduct" element of a RICO claim. Racketeering activity under the RICO statute includes a wide range of criminal conduct. 18 U.S.C. § 1961(1); *Al-Abood ex rel. Al-Abood v. El-Shamari*, 217 F.3d 225, 238 (4th Cir. 2000). Among the predicate criminal acts covered by the RICO statute are enumerated federal offenses, including mail and wire fraud. 18 U.S.C. § 1961(1) (referring to 18 U.S.C. §§ 1341 (mail fraud) & 1343 (wire fraud)). To prove a claim for mail or wire fraud, a plaintiff must show that (1) the defendant "knowingly participated in a scheme to defraud," and (2) the mail or wire communications were used to further that scheme. *WW, LLC v. Coffee Beanery, Ltd.*, No. WMN-05-3360, 2012 WL 3728184, at *10 (D. Md. Aug. 27, 2012) (citation omitted); *see also United States v. Curry*, 461 F.3d 452, 457 (4th Cir. 2006). Wire usage includes the internet and email. *Brasko v. Howard Bank*, No. SAG-20-3489, 2021 WL 1662464, at *5 (D. Md. Apr. 27, 2021) (citing cases). The mailings or wirings need not themselves be an essential element of the fraudulent scheme or contain the misrepresentations that defrauded the plaintiff, but they must be in furtherance of the scheme. *See Chisolm v. TranSouth Fin. Corp.*, 95 F3d 331, 337 (4th Cir. 1996); *Proctor*, 645 F. Supp. 2d at 473; *Schmuck v. United States*, 489 U.S. 705, 715 (1989) ("'[I]nnocent' mailings—ones that contain no false information—may supply the mailing element," as can routine mailings (quotation omitted)).

"When mail and wire fraud are asserted as predicate acts in a civil RICO claim, each must be pled with particularity, pursuant to Rule 9(b)." *Proctor*, 645 F. Supp. at 473 (citing *Menasco, Inc. v. Wasserman*, 886 F.2d 681, 684 (4th Cir. 1989)).  Rule 9(b) states that in alleging fraud, "a party must state with particularity the circumstances constituting fraud."  Such circumstances include "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Weidman v. Exxon Mobile Corp.*, 776 F.3d 214, 219 (4th Cir. 2015) (quoting *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999)).  Nonetheless, a "court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts." *Harrison*, 176 F.3d at 784.

Shapiro generally alleges that Shellpoint engaged in a scheme to place loans into forbearance without obtaining borrowers' consent and then profit from that forbearance by either collecting incentive fees through workout options or earning "float" income on unapplied funds.  ECF 2, at 6–8.  But Shapiro's own assertions and materials undermine his allegations.  Shapiro attaches a May 2020 letter stating that he was approved for a forbearance plan (ECF 2-1, at 57); a June email from Mary Stone stating that Shellpoint cancelled his forbearance and reinstated his automatic payments (*id.* at 51); an August letter stating that his loan was delinquent (*id.* at 60); an October letter stating that an error occurred (*id.* at 66); and various snapshots of his credit report.  Even drawing all inferences in Shapiro's favor, the Court cannot plausibly infer from these communications that Shellpoint "knowingly participated in a scheme to defraud" as required by 18 U.S.C. §§ 1341 & 1343.  *See Coffee Beanery*, 2012 WL 3728184, at *10.  In the May 2020 letter, Shellpoint informed Shapiro of his loan's forbearance status rather than misleadingly

13

placing his loan into forbearance without his consent. This notification would have thwarted any fraudulent scheme to convert loan statuses without authorization, as Shapiro could (and did, at least for June) continue to make payments, negating the need for any loan workout options. While Shellpoint's June email statements that it reinstated Shapiro's automatic payments were incorrect, Shellpoint subsequently admitted it made an error. Shapiro's complaint does not plausibly allege a fraudulent scheme—or anything beyond an ordinary business dispute stemming from a mistake. He thus has not adequately alleged predicate acts of racketeering activity.[5]

### 3. Pattern of Racketeering Activity

Even had Shapiro adequately alleged the existence of an enterprise and the predicate acts of mail and wire fraud, he also must allege a pattern of racketeering activity. The RICO statute requires "at least two" acts of racketeering activity within a 10-year period. 18 U.S.C. §§ 1961(5), 1962(c). To establish the necessary pattern, a plaintiff must show "that the racketeering predicates are related and that they amount to or pose a threat of continued criminal activity." *Chambers*, 43 F. Supp. 3d at 599 (quoting *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989)). This continuity-of-activity requirement may be met either by "a closed period of repeated conduct" or by "past conduct that by its nature projects into the future with a threat of repetition." *H.J. Inc.*, 492 U.S. at 241. Courts refer to these alternatives as closed-ended and open-ended continuity,

---

[5] The Court further notes that Shapiro also fails to adequately allege a scheme to defraud others. Plaintiffs can adequately allege that a defendant knowingly participated in a fraudulent scheme by "outlin[ing] the alleged scheme to defraud, a timeframe for the scheme, who was targeted by the scheme, the contents of the allegedly fraudulent communications that were sent using the mails and wires, and what Defendants hoped to obtain through the scheme," among other particulars. *See Coffee Beanery*, 2012 WL 3728184, at *10–11. Shapiro does not allege who Shellpoint supposedly targeted, which (or which type of) loans Shellpoint placed into unwanted forbearance, or when. Apart from listing various "matters and things" that Shellpoint "potentially" sent via mail or wire, he does not identify the date, sender, recipient, or contents of communications. ECF 2, at 13–14. To the extent Shapiro alleges the scheme to defraud included victims other than him, he has failed to plead this element of the RICO claim.

respectively.  Courts employ a fact-based, "commonsensical" approach to determine whether this requirement is met.  *Menasco, Inc. v. Wasserman*, 886 F.2d 681, 684 (4th Cir. 1989); *H.J. Inc.*, 492 U.S. at 241.  Relevant factors include the breadth of the goal, the number of perpetrators, the number of victims, the length of the scheme or transaction, and the "scale on which racketeering is conducted" such as the "variety of stratagems" employed.  *Menasco*, 886 F.2d at 684.  "Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long-term criminal conduct."  *H.J. Inc.*, 492 U.S. at 242.

Shapiro does not plausibly allege closed-ended continuity.  A closed-ended pattern of racketeering activity requires "a course of related predicate acts during a substantial period of time which naturally comes to a close."  *Chambers*, 43 F. Supp. 3d at 599–600 (citation omitted).  Shapiro asserts that Shellpoint had disconnected his automatic payments for three months: June, July, and August 2020.  He acknowledges that Shellpoint admitted and fixed the error.  This short timeframe alone indicates that he does not allege the type of "substantial," long-term criminal conduct that RICO aims to root out.  Moreover, Shapiro does not specify if or when Shellpoint allegedly defrauded others in a similar manner.  He does include in his complaint a screenshot of an article that describes an incentive fee program for servicers in response to the COVID-19 pandemic, but the article notes only that the program was set to take effect in July 2020 "pending approval."  ECF 2, at 8–10.  These allegations fall far short of describing repeated conduct "extending over a substantial period of time" that might constitute a closed-ended pattern of racketeering activity.  *H.J. Inc.*, 492 U.S. at 241–42.

Shapiro likewise does not plausibly allege open-ended continuity.  An open-ended pattern involves conduct "that by its nature projects into the future with a threat of repetition" against

15

additional victims. *Chambers*, 43 F. Supp. 3d at 600 (quoting *Coffee Beanery*, 2012 WL 3728184, at *12). The Fourth Circuit has rejected RICO claims supported only by conclusory allegations about other fraudulent acts against unidentified victims. *Menasco*, 886 F.2d at 684; *Foster v. Wintergreen Real Est. Co.*, 363 F. App'x 269, 274 (4th Cir. 2010) (unpublished) (per curiam) (holding allegations of hundreds of other victims lacked requisite particularity to establish open-ended continuity); *see also Layani v. Ouazana*, No. ELH-20-420, 2021 WL 805405, at *38 (D. Md. Mar. 3, 2021) (holding allegations of ten known but unnamed non-party victims and ongoing "efforts to recruit new investors" by the defendants did not satisfy Rule 9(b)). Shapiro describes at length Shellpoint's servicing of his own loan. But while he alludes at times to other borrowers, he gives no specifics. *See, e.g.*, ECF 2 at 11 ("[Shellpoint] treats borrowers' loans as being in forbearance status, [sic] They don't report its receipt and application of borrowers' payments received during the forbearance period."). The Court cannot plausibly infer open-ended continuity from Shapiro's vague allusions to other victims.

The Fourth Circuit cautions that courts should not allow plaintiffs to turn "garden-variety fraud claims" into civil RICO violations. *Al-Abood*, 217 F.3d at 238; *see also Foster*, 363 F. App'x at 274 (holding allegations of "multiple instances of mail and wire fraud over the course of an arguably substantial period of time" was nonetheless "garden-variety fraud" and not above the routine). Shapiro seeks to do just that. Without other victims, the totality of the circumstances described by Shapiro's allegations—a single business interaction over several months—does not reflect criminal activity "above the routine." *See Foster*, 363 F. App'x at 274 (quoting *HMK Corp. v. Walsey*, 828 F.2d 1071, 1074 (4th Cir. 1987)). "Courts considering schemes that were of short duration, involving a narrow focus, a single victim, and posing no threat of continuing future criminal activity, have consistently found that no pattern of racketeering activity was established."

*Walsh v. Mitchell*, No. DKC-08-1897, 2010 WL 3719919, at *9 (D. Md. Sept. 17, 2010) (citing cases). Shapiro has not sufficiently alleged a pattern of racketeering activity.

Shapiro's RICO claim is dismissed without prejudice.

### B. CARES Act claim

Shapiro seeks declaratory relief stating that Shellpoint violated the CARES Act. ECF 2, at 18. Shapiro acknowledges, however, that this Act "does not provide an independent private right of action for borrowers whose loans are impacted by servicer misconduct in violation of the CARES Act's express requirements." *Id.*; *see Profiles, Inc. v. Bank of Am. Corp.*, No. SAG-20-0894, 2020 WL 1905694, at *1 (D. Md. Apr. 17, 2020) (noting that "the CARES Act provides neither an express nor an implied private right of action"). This claim is dismissed with prejudice.

### C. Truth in Lending Act claim

The Truth in Lending Act requires creditors to make certain disclosures to consumers. 15 U.S.C. § 1601 *et seq.* Shapiro alleges that Shellpoint "is responsible for collecting and applying borrowers' payments on behalf of the owner of the borrowers' mortgage loans in accordance with the requirements of . . . TILA . . . as implemented through Regulation [Z]." ECF 2, at 7. Shapiro has not identified any specific statutory or regulatory provision that Shellpoint allegedly violated nor made clear how Shellpoint's alleged conduct violates TILA. His TILA claim is dismissed without prejudice.

### D. Real Estate Settlement Procedures Act claim

RESPA was enacted to combat "'certain abusive practices' in the real estate mortgage industry, and to ensure 'that consumers throughout the Nation are provided with greater and more timely information on the nature and costs of the settlement process.'" *Robinson v. Nationstar Mortg. LLC*, No. TDC-14-3667, 2019 WL 4261696, at *5 (D. Md. Sept. 9, 2019) (citing 12 U.S.C.

§ 2607(a)).  Its implementing regulations, known as "Regulation X," impose additional duties and responsibilities on mortgage servicers.  *Id.*  As with his Truth in Lending Act claim, Shapiro does not identify a specific statutory or regulatory provision that Shellpoint allegedly violated or indicate how Shellpoint's alleged conduct violates RESPA.  *See* ECF 2, at 18 (alleging that Shellpoint "has (potentially) violated . . . RESPA" without specifying why or how).  His RESPA claim is dismissed without prejudice.

### E.  State causes of action

Without any surviving federal claims, the Court declines to exercise supplemental jurisdiction over Shapiro's state claims for breach of contract, gross negligence, and fraud and remands them to the state court pursuant to 28 U.S.C. § 1367(c).

## IV.  Conclusion

For the foregoing reasons, the Court grants the defendant's motion to dismiss the RICO, TILA, and RESPA claims without prejudice and grants the defendant's motion to dismiss the CARES Act claim with prejudice.  The Court remands the remaining state claims.  A separate order follows.

1/30/2023
Date

Deborah L. Boardman
United States District Judge